UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


| | | |
|---|---|---|
| ANDOVER SCHOOL COMMITTEE, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. |
| | ) | 12-12288-DPW |
| | ) | |
| v. | ) | |
| | ) | |
| BUREAU OF SPECIAL EDUCATION | ) | |
| APPEALS OF THE DIVISION OF | ) | |
| ADMINISTRATIVE LAW APPEALS, | ) | |
| MASSACHUSETTS DEPARTMENT OF | ) | |
| ELEMENTARY EDUCATION, and | ) | |
| JOHN DOE and JANE DOE, | ) | |
| | ) | |
| Defendants. | ) | |

**CONSOLIDATED WITH**

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. |
| | ) | 13-10184-DPW |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BUREAU OF SPECIAL EDUCATION | ) | |
| APPEALS OF THE DIVISION OF | ) | |
| ADMINISTRATIVE LAW APPEALS, | ) | |
| MASSACHUSETTS DEPARTMENT OF | ) | |
| ELEMENTARY EDUCATION, and | ) | |
| ANDOVER SCHOOL COMMITTEE, | ) | |
| | | |
| Defendants. | | |

MEMORANDUM AND ORDER
November 21, 2013

-1-

The Andover School Committee ("Andover") filed this action in this court seeking judicial review of a decision of the Massachusetts Bureau of Special Education Appeals ("BSEA"), made pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, regarding its attempt to place a special education student ("Student") in a private special education school.  Student's parents, John and Jane Doe, ("Parents") who oppose the out-of-district placement, filed a separate action in Massachusetts state court seeking judicial review of the same BSEA decision.  Andover and the BSEA removed that case to this court and the two cases were then consolidated. The parties have submitted cross-motions for summary judgment.

## I.   BACKGROUND

### A.   *Statutory Framework*

The IDEA was enacted "to ensure that all children with disabilities have available to them a free appropriate public education ["FAPE"] that emphasizes special education and related services to meet their unique needs and prepare them for further education, employment, and independent living."  20 U.S.C. § 1400(d)(1)(A).  As a condition for receiving federal funding under the IDEA, a state must offer every disabled child within its jurisdiction a FAPE in the least restrictive environment

-2-

possible.  *See* 20 U.S.C. § 1412(a)(1), (5).  If a state is unable to provide a disabled child with a FAPE through a public school placement, it may be obligated to subsidize the child in a private program.  *See D.B. ex rel. Elizabeth B.* v. *Esposito*, 675 F.3d 26, 34 (1st Cir. 2012).  Massachusetts implements and supplements the federal requirements found in the IDEA through state law and regulation.  *See* Mass. Gen. Laws ch. 71B; Mass. Code Regs. 28.01 *et seq.*

"The 'primary vehicle' for delivery of a FAPE is an IEP [Individualized Education Program]."  *D.B.*, 675 F.3d at 34 (quoting *Lessard* v. *Wilton Lyndeborough Coop. Sch. Dist.*, 518 F.3d 18, 23 (1st Cir. 2008) (*Lessard I*)).  An IEP must be "individually designed" to suit a particular child, *Board of Educ. Of Hendrick Hudson Cent. Sch. Dist*. v. *Rowley*, 458 U.S. 176, 201 (1982), and must include, "at a bare minimum, the child's present level of educational attainment, the short- and long-term goals for his or her education, objective criteria with which to measure those goals, and the specific services to be offered," *Lessard I*, 518 F.3d at 23 (citing 20 U.S.C. § 1414(d)(1)(A)).

"[T]he obligation to devise a custom-tailored IEP does not imply that a disabled child is entitled to the maximum educational benefit possible."  *Lessard I*, 518 F.3d at 23; *see*

*Rowley*, 458 U.S. at 198.  The Supreme Court has stated that an IEP must offer only "some educational benefit" to a disabled child.  *Rowley*, 458 U.S. at 200.  "Thus, the IDEA sets 'modest goals: it emphasizes an appropriate, rather than an ideal, education; it requires an adequate, rather than an optimal, IEP.'"  *D.B.*, 675 F.3d at 34 (quoting *Lenn* v. *Portland Sch. Comm.*, 998 F.2d 1083, 1086 (1st Cir. 1993)).  However, "the IDEA calls for more than a trivial educational benefit, in line with the intent of Congress to establish a 'federal basic floor of meaningful, beneficial educational opportunity.'"  *D.B.*, 675 F.3d at 34 (quoting *Town of Burlington* v. *Dep't of Educ. of Mass.*, 736 F.2d 773, 789 (1st Cir. 1984)).  To comply with the IDEA, an IEP must be "reasonably calculated to confer a meaningful educational benefit."  *See D.B.*, 675 F.3d at 34, and cases cited.

The IEP is developed by an "IEP Team," which includes the parents, a regular and special education teacher, a representative of the educational agency, an individual who can interpret evaluation results, and other individuals who have "knowledge or special expertise regarding the child."  20 U.S.C. § 1414(d)(1)(B).  "To ensure the continued adequacy of a child's IEP, the IDEA requires that it be reevaluated annually through a collaborative process that involves the child's parents and educators."  *D.B.*, 675 F.3d at 35 (citing 20 U.S.C. § 1414(d)).

"If this process breaks down and no consensus emerges, the child's parents may challenge either the school system's handling of the IEP process or the substantive adequacy of the IEP itself by demanding an administrative due process hearing before a designated state educational agency." *D.B.*, 675 F.3d at 35 (citing 20 U.S.C. § 1415(f)(1)(A)); *see Lenn*, 998 F.2d at 1086. "A public school system has essentially the same right if, for example, it seeks to test the validity of a proposed IEP or it wishes to challenge an existing IEP as over-accommodating." *D.B.*, 675 F.3d at 35; *see Schaffer ex rel. Schaffer* v. *Weast*, 546 U.S. 49, 53 (2005); *Lessard* v. *Wilton-Lyndeborough Coop. Sch. Dist.,* 592 F.3d 267, 269 (1st Cir. 2010) (per curiam) *(Lessard II)*.  The burden of persuasion in the resulting hearing lies with the party seeking relief.  *See Schaffer*, 546 U.S. at 62.

Both federal and state regulations govern the procedures applicable to hearings before the educational agency, which in Massachusetts is the BSEA.  *See* 20 U.S.C. § 1415; 34 C.F.R. §§ 300.507-300.508; Mass. Gen. Laws ch. 71B, § 2A: 603 Mass. Code Regs. 28.08.  Decisions of hearing officers are final and reviewable by either a federal or state court of competent jurisdiction.  *See* 20 U.S.C. § 1415(i)(1)(A), 1415(i)(2)(A). Having exhausted the IDEA's administrative due process hearing procedures, "[e]ither side may then appeal from the hearing

officer's final decision to either a federal or state court of competent jurisdiction." *Lessard I*, 518 F.3d at 24; *see also* 20 U.S.C. § 1415(i)(2)(A).

**B.  Factual Background**

　　1.  Student's Background and Educational History

In 2004, when he was in the first grade, Student underwent neuropsychological evaluation and was diagnosed with Asperger's Syndrome. *See* Functional Behavioral Assessment, Feb. 28, 2011, A.R. 250-54. Student's former school district developed a plan pursuant to Section 504 of the Rehabilitation Act of 1973, which called for occupational therapy, behavioral intervention, and a 1:1 aide. *Id.* at 250.

During the second grade, Student had several major episodes of physical outbursts toward staff and peers, displayed aggressive behaviors where he tried to flee or hurt himself, and occasionally had to be physically restrained. *Id.* The episodes occurred when he was asked to do things he did not want to do. Following another psychological evaluation, the former school district developed an IEP for Student that featured a more structured behavioral plan than the 504 plan. *Id.*

Student entered the Andover school system in 2006, attending third grade at the West Elementary School. Although Student became less physically aggressive as he grew older, between the

-6-

third and fifth grade, he had several incidents of threatening behaviors and gestures directed at staff and peers resulting in multiple suspensions from school.  While in class, Student only wanted to draw in his notebook.  *Id.*

Student enrolled at the Wood Hill Middle School in Andover as a sixth grader in 2009.  Student had great difficulty adjusting to academic and behavioral expectations in his sixth grade year.  Functional Behavioral Assessment, Feb. 28, 2011, A.R. 250.  Student was focused almost exclusively on cartooning during class, and was extremely resistant to redirection.  *Id.* Student presented with "significant behavioral issues, including inflexibility, aggressive verbal outbursts, one verbal threat to an adult, violent/inappropriate drawings including those of his peers, and [nine] incidents leading to suspensions."  *Id.* Despite being "a very bright boy," Student exhibited serial noncompliance with instructions given to him by his teachers, and was disengaged socially from his peers.  Testimony of Dr. Jeff Bostic, A.R. 696-97.

School interventions included multiple IEP Team meetings, consultations with a psychologist, and with Andover's consulting psychiatrist, Dr. Jeff Bostic.  *Id*.  In November 2009, Andover conducted a three-year re-evaluation.  See A.R. 914.  The IEP Team, in consultation with Dr. Bostic, recommended a forty-five

day out-of-district placement at the North Shore Education
Consortium for assessment purposes.  *Id.* at 51.  The IEP Team
felt the placement was necessary because the Team "did not have
the correct information, skills or setting to reduce the current
behaviors which were excluding [Student] from his learning
environment."  Functional Behavioral Assessment, Feb. 28, 2011,
A.R. 251.  Parents initially rejected this recommendation.  *Id.*

Despite ongoing behavioral support, Student had demonstrated
no significant improvement by the beginning of his seventh grade
year.  *Id.*  In December 2010, Parents agreed to a forty-five day
evaluation at the North Shore Consortium.  Testimony of Linda
Croteau, A.R. 797.

Student attended the North Shore Consortium in January and
February 2011.  Testimony of Linda Croteau, A.R. 797.  He was
placed in the Prep Program, which features "specific services and
supports for students who tend to be more vulnerable socially."
STAR Assessment Report, Feb. 10, 2011, A.R. 278.  He succeeded in
the program and received a positive report at the conclusion of
his time there.  Testimony of Linda Croteau, A.R. 798.  The
report indicates that Student was "compliant and polite to both
peers and staff," and "was able to follow all adult instructions
in an appropriate and respectful manner."  STAR Assessment
Report, A.R. 278.  Although he "continued to be very focused and

somewhat obsessed with doodling and cartooning," he accepted
"without any difficulty or disrespect" that he must complete all
his assignments to the teachers' satisfaction before he could
draw.  *Id.*  The content of his drawings while at North Shore
Consortium appeared non-violent and otherwise appropriate.  *Id.*
He did make "quite clear," however, that he "chose[] to do really
well and do everything that [was] asked of him without resistance
with the sole goal of returning to his middle school."  *Id.*

Academically, all of Student's teachers at the North Shore
Consortium noted that he is "an extremely bright student who has
advanced abilities in all academic subjects."  STAR Assessment
Report, A.R. 279.  The report continues that Student "quickly
picks up new information and concepts and has been able to
complete all assignments and work over the course of the 45 days
easily and without difficulty.  As a result, his teachers have
had to be prepared to have additional work for him, as he quickly
completes the assigned work."  *Id.*  The report also notes that
"[s]ocially, [Student] has been observed to be quiet, withdrawn
and fairly isolative, preferring to engage in solitary activities
both within and outside the class room."  *Id.* at 278.

Upon completion of his extended evaluation at the North
Shore Consortium, the staff there recommended that given
Student's success in the "therapeutic setting" of the Prep

-9-

Progam, Student "may benefit from a smaller academic setting,"
with a staff of "trained professionals who can understand and
effectively manage [Student's] complex profile of
social/emotional challenges and the resultant impact they have
upon his academic progress and performance" by "provid[ing]
consistent and predictable behavioral programming throughout the
day."  STAR Assessment Report, A.R. 282.

Following an IEP Team meeting to review the evaluations and
recommendations made by North Shore Consortium, the Team proposed
that Student either continue in the North Shore Prep Program on
an indefinite, full-time basis, or accept another out-of-district
placement at the Gifford School.  Testimony of Linda Croteau,
A.R. 798-800; 2011 IEP, A.R. 73.  The parents rejected both
offers of placement, and Student returned to Wood Hill Middle
School.  Testimony of Linda Croteau, A.R. 800.

In February 2011, Andover conducted a Functional Behavioral
Assessment (FBA), consisting of a review of past testing,
classroom observations, interviews with teachers and Parents, and
consultations with the school psychologist and Dr. Bostic
Functional Behavioral Assessment, Feb. 28, 2011, A.R. 250.  The
FBA report notes that past behavioral supports resulted in no
significant improvement in Student's overall progress.  *Id.* at
251.  The report attributes an escalation in Student's behavioral

difficulties, namely his "rigidity, inflexibility and non-compliance" to the demands that are placed on him "academically, socially, and behaviorally in the larger [public middle school] environment. *Id.* at 253.  More specifically, Student encounters and must take direction from numerous adults throughout the day, in classrooms with varying classroom structures, in a way that does not "provide for the consistency and direct feedback that [Student] needs in order for him to comply with adult directions, school rules and self-monitor his behavior." *Id.*  The report notes Student "is extremely resistant to any supports in the regular education setting," and that assigning a paraprofessional to individually monitor and support him "caused [Student] a great deal of anxiety and stress leading to paranoid thinking which in turn exacerbated his behavioral responses." *Id.*

The FBA report recommended creating a behavior plan with clear and consistent expectations; providing direct and immediate feedback to Student regarding his behavior; encouraging Student to verbalize his feelings of anxiety or frustration appropriately; providing classroom assistant support; creating rubrics demonstrating academic expectations; using written contracts with Student for non-preferred topics or activities; teaching of explicit social skills, self-regulating strategies; facilitating frequent communication with Parents and outside

providers.  Functional Behavioral Assessment, A.R. 254.  The
report's final recommendation is that "[i]nstruction design
should possibly include the consideration for a more limited
environment in order to provide immediate feedback to [Student]
regarding his progress."  *Id.*

Student completed seventh grade at the middle school.  A.R.
526.  A year-end IEP progress report indicates that Student was
able to follow classroom behavioral rules or guidelines in his
core academic classes sixty-five percent of the time, falling
short of the IEP's goal of seventy-percent.  *Id.* at 526-27.  In
other settings, Student demonstrated compliance in only one-to-
two out of five opportunities, falling short of the stated goal
of three-out-of five opportunities.  *Id.*  Student completed only
between forty- and fifty-percent of his assigned work.  *Id.*  He
used words to express his frustration or verbalize his needs in
only one-to-two out of five opportunities, falling short of the
stated goal of three-out-of five opportunities.  *Id.*

Student returned to the middle school for eighth grade in
the 2011-2012 school year.  In January 2012, Student was
suspended from school after writing an essay about conflicts with
teachers and plans to prove the teachers wrong, and after he was
overheard discussing "a surprise type of action to alter the
school."  Jeff Bostic, M.D., Psychiatric and Risk Assessment,

January 10, 2012, A.R. 205; Testimony of Martha Hyslip, A.R. 1048.  Following this incident, Student was referred to Dr. Bostic for a "Psychiatric and Risk Assessment."  The assessment consisted of interviews with Student, Mother, and school staff members.  Psychiatric and Risk Assessment, A.R. 205.

Dr. Bostic concluded that Student posed a "low risk" to harm himself or others, but noted his concern that other students who are properly "acculturated to the extreme inappropriateness of using phrases about harming others . . . may not appreciate or recognize that [Student's] use of these terms or phrases does necessarily mean what it would coming from another student." Psychiatric and Risk Assessment, A.R. 210.

According to Dr. Bostic, "[i]n simplest terms, [Student] does not 'trust' adults, particularly school staff, as they penetrate his world and indeed 'require' [him] to compartmentalize his interests (e.g., comics) and engage in the classroom instruction and tasks shared by his peers."  *Id*. at 209.  Dr. Bostic's report continues that "[p]erhaps most importantly, [Student] is not engaging more as he matures, or learning how to engage meaningfully with others; he is not practicing, or moving toward, skills that will enable him to function autonomously, whether in school/academic settings . . . or with peers or family."  *Id.*

-13-

Dr. Bostic concluded his report by observing that, "[a]ccordingly, [Student] is not making effective educational progress in his current setting. . . . At this time, [Student] would benefit from a smaller environment with more familiar others (staff and peers) where trust could more easily occur, and where therapeutic interventions could be infused throughout the school experience to address his ability to produce academically and to benefit from social interactions." *Id.* at 211.

On January 27, 2012, Andover and Parents entered into a mediation agreement stipulating that Parents would consent to Andover sending referral packets to the Arlington School, New England Academy, the Dearborn School and the Gifford School to assess Student's suitability for placement.  Mediation Agreement, Jan. 27, 2012, A.R. 215-16.  Parents further agreed to visit these schools with Student, and Andover agreed to fund Student's placement at and provide transportation to a school that accepted him.  *Id.*

The only school to accept Student was the Gifford School. Testimony of Joyce Laundre, A.R. 1122.  Parents and Student visited Gifford twice, but deemed it to be an inappropriate placement.  Testimony of Father, A.R. 1199-1203. Specifically, Parents did not feel that the academics would be challenging enough for Student or that the peer group would be appropriate.

*Id.*  Parents were also concerned that the Gifford School would not adequately encourage or prepare Student to pursue higher education.  *Id.*  In an effort to place Student at the Gifford School over Parents' objection, Andover filed a hearing request with the BSEA on April 12, 2012.

Student finished eighth grade at the middle school. Student's year-end report card reflected mostly grades of B and C, with a slight upward trend in his grades as well as an upward trend in "effort" and "conduct" marks from term to term.  A.R. 510-511.

In June 2012, shortly before the end of the school year, Parents obtained an FBA for Student from Brian Doyle, Ed.D., who is a Board Certified Behavioral Analyst.  Testimony of Brian Doyle, A.R. 985-986.  Dr. Boyle reviewed records, interviewed Student, Parents, and some staff members, and observed Student at school for approximately two hours.  Consultation Summary, A.R. 512-22.  In his report, Dr. Boyle noted that based on his review of Student's records, Andover had not provided Student with ongoing behavioral support from a behavior analyst.  *Id.* at 520-21.  Further, despite references by staff members to failed behavioral plans, the School produced only one such plan for Dr. Doyle's review, which was primarily a set of guidelines for Student with no prescribed interventions by teachers and other

-15-

staff.  *Id.*  Dr. Doyle characterized the school-performed FBA of
February 2011 as largely anecdotal, with no data on antecedents,
specific behaviors or consequences.  *Id.*  In the absence of such
data, Dr. Doyle stated that it would be difficult to track
Student's progress.  *Id.*

In conclusion, Dr. Doyle opined that he felt Student could
function in a public school setting because he could maintain
passing grades, posed little risk to himself or others, had
motivation to remain in public school, and had demonstrated the
ability to modify his behavior with "a clear goal, consistent
structure, and supportive response to his documented
disabilities."  *Id.* at 521.  Dr. Doyle admitted that although he
had worked with a client at Andover High School before, he was
not overly familiar with the school.  Testimony of Brian Doyle,
A.R. 1030-31.  Dr. Doyle recommended a data-driven FBA "to
reevaluate the possible functions of specifically targeted
behaviors, their situational occurrence, and response to
intervention," a behavior intervention plan based on the FBA, and
consultation with a BCBA or doctoral level professional, among
other things.  Consultation Summary, A.R. 521.  On cross-
examination at the BSEA hearing, Dr. Boyle admitted that he
allowed Parents to view a draft version of his report and suggest

additions, some of which he did indeed incorporate in the final version.  Testimony of Brian Doyle, A.R. 1021-25.

On August 10, 2012, Student's IEP Team convened to consider Dr. Doyle's report and issued an N-1 form proposing an IEP amendment and an outside placement.  N-1 Form, Aug. 10, 2012, A.R. 476-77.  The proposal included retaining a BCBA, as recommended by Dr. Boyle, to provide direct consultation to staff, Student, and Parents for a minimum of "2-hours per week to the school and 2-hours per week to home."  *Id.* at 477.  The proposal also included completing an updated FBA and if necessary, the development of a behavior intervention plan including a data collection method, as recommended by Dr. Boyle. *Id.*  Finally, the proposal also included the provision to Student of counseling services and two hours per week of after school tutoring. *Id.*  The proposal made clear, however,

> "that [Andover] maintains that [Student] requires a highly structured small setting within a therapeutic milieu.  [Student] requires a systematic, consistent behavioral program embedded throughout the school day which allows [Student] to process behavior within the classroom setting and immediate access to a social worker or counselor when he is unable to self-regulate in the classroom.  Accordingly, the proposed services are offered within the context of a comprehensive therapeutic day program."

*Id.*

2.   Program Proposed by Andover

Andover proposed placing Student at the Gifford School.
Testimony of Stephen Jankauskas, A.R. 933; Closing Argument, A.R.
1244-46.   At the hearing, most of the evidence regarding Gifford
was offered through the testimony of Andover's out-of-district
placement coordinator, Stephen Jankauskas.   *Id.* at 933-56.

Gifford is a co-educational private, day school located in
Weston, Massachusetts, and approved by the Massachusetts
Department of Elementary and Secondary Education in accordance
with 603 Mass. Code Regs. 28.09.   *Id.* at 935, 955; Testimony of
Joyce Laundre, A.R. 1137.   It features average class sizes of
eight to ten students, and follows the Massachusetts Curriculum
Framework.   Testimony of Stephen Jankauskas, A.R. 935, 955.   All
of the teachers are subject-area certified and are either
certified in special education or enrolled in master's degree
programs for special education.   *Id.* at 935, 954-55.   Gifford has
a supervising psychiatrist and other clinicians on staff,
provides individual and group counseling, and is capable of
providing "in the moment" behavioral interventions.   *Id.* at 939-
40, 944-45;   Testimony of Joyce Laundre, A.R. 1139.   Gifford
provides a "therapeutic milieu," in which all the staff are
trained in the specialized methodologies employed by the program
and social and emotional support is "embedded throughout the

-18-

day". *Id.* at 948; Testimony of Joyce Laundre, A.R. 1139.  The
high school program uses a "point and level" behavior management
system under which students earn increasing degrees of freedom
based on meeting academic and behavioral expectations.  *Id.* at
946-48.

Mr. Jankauskas testified that in his opinion, based on his
experience with Gifford and observation of its high school
program, Gifford would be an appropriate placement for Student.
*Id.* at 952.  In his experience, Gifford serves students on the
autism spectrum, including students similar in profile to
Student, as well as students with other types of emotional issues
who respond positively to a highly structured therapeutic milieu.
*Id.* at 953-54.  The students there are of average to above
average cognitive ability.  *Id.* at 954.  At the time of the
hearing, Andover had at least one student with high-functioning
autism or Asperger's and behavioral concerns placed at Gifford.
*Id.* at 945; Testimony of Joyce Laundre, A.R. 1136.  Although some
of the students at Gifford have behavioral issues, Mr. Jankauskas
testified that "acting out [type] behavior is not the norm in the
high school program at all."  *Id.* at 947.

3.  Program Proposed by Parents

Parents seek to have Student attend Andover High School
(AHS) with the support of a behavior intervention plan as

-19-

recommended by Dr. Boyle and proposed in the August 10, 2012 N-1
form.  Closing Argument, A.R. 1246-1248.  They believe he is
motivated and capable of success in the public school setting, as
demonstrated by his largely satisfactory report card which
demonstrated some upward trending.  *Id.;* Testimony of Father,
A.R. 1181-84.  Parents introduced into evidence a number of
"Student Observation/Reflection Form[s]" that they obtained from
Andover during discovery; the forms contain scores from 0-4 based
on Student's behavior in each class period of the day; Student
received mostly 3s, with some 2s and some 4s.  A.R. 497-509.[1]
Parents offered as evidence Student's MCAS scores for grades six
and seven, which indicated that Student was "advanced" in both
English Language Arts and Mathematics in grade six, and
"proficient" in English Language Arts and "advanced" in
Mathematics in grade seven, although the reports did show that
Student's "growth percentile" – a measure of how he scored in a
given year relative to students who received the same score as
him in the previous year – diminished significantly from grade
six to grade seven.  A.R. 644-45.  Parents also offered Student's

---

[1] These forms were apparently filled out by teaching assistants
assigned to observed Student's behavior over the course of the
day; the forms also contain written comments detailing any
behavior that the assistants considered to be the least bit
inappropriate.  See A.R. 497-509; Testimony of Martha Hyslip,
A.R. 1038-46.  Student felt these people were spying on him.
Testimony of Linda Croteau, A.R. 872-74; 906-07.

Secondary School Admission Test (SSAT) score report from grade eight, which indicated that Student scored in the seventy-eighth percentile of test takers.  A.R. 646.

Additionally, parents offered evidence that, contrary to the testimony of Andover's witnesses, Student has friends and has participated in extracurricular group actives, such as the school band, rowing club, as well as attended a summer camp without incident.  Testimony of Father, A.R. 1182, 1227-32.  Parents attempted to demonstrate on cross-examination of several of Andover's witnesses, and through testimony of the Father, that student was a talented artist and that in many instances the school was taking Student's drawings out of context in an effort to find objectionable content.  Testimony of Linda Croteau, A.R. 895-96;  Testimony of Father, A.R. 1209-1211; Student Drawing, A.R. 403; *See generally,* Student Drawings, A.R. 303-430.

Based on their visit to Gifford and conversations with staff there, Parents do not believe that Gifford will challenge Student academically, or adequately prepare student to pursue higher education.  Testimony of Father, A.R. 1201-1203.  Father also testified that based upon his visit to the school, students at Gifford "look like – not like normal kids, my impression. Learning disability or other disability.  That's the first impression."  *Id.*

-21-

According to John Norton, the program advisor for special education at AHS, AHS has an enrollment of approximately 1800 students including approximately 250 students on IEPs. Testimony of John Norton, A.R. 1155. AHS offers a variety of special education programs. *Id.* at 1156. After attending the August 10, 2012 IEP Team meeting and reviewing the various evaluations of Student, Mr. Norton formed the opinion that Student requires "continuous therapeutic intervention and on-the-spot, sort of in-the-moment processing as well." *Id.* at 1159. According to Mr. Norton, AHS does not have the ability to provide this type of academic setting. *Id.* Given his lack of progress in the smaller, highly-collaborative and team-oriented middle school environment, Mr. Norton has "grave concerns" about Student's ability to succeed in a traditional high school environment where he would need to take instruction from five different teachers from different department who have little or no regular communication or coordination. *Id.* at 1164-65. Further, with approximately thirty students per class, classroom teachers do not have the ability to cater to a single student who needs near constant behavioral interventions. *Id.* AHS simply lacks the ability to provide the consistent, systematic intervention that Student requires. *Id.* at 1169.

Joyce Laundre, Director of Special Education at the middle school, testified that having so-called "one-to-one" support in the public high school setting is more restrictive than an out-of-district placement because of the stigma attached to having an in-classroom assistant assigned to one particular student.  A.R. 1140.  Student's social issues, which have not significantly improved in middle school, would become even more challenging in the high school environment.  *Id.* at 1163-64.  Although there are other students with Asperger's Syndrome who have succeeded at AHS, they differ from Student in that they are willing to accept the support offered to them in the regular education setting. *Id.* at 1163, 1174.

## C.  *BSEA Proceedings*

Andover requested a hearing before the BSEA on April 12, 2012, after Parents rejected an out-of-district placement.  A hearing was held on August 15, 16 and 17, 2012.  Parents appeared *pro se*, and after evidence was presented on both sides and oral closing arguments were heard, the Hearing Officer issued a decision on September 11, 2012.  Bureau of Special Education Appeals, Decision No. 12-7315 (Sept. 11, 2012) [hereinafter BSEA Decision].

Based on the evidence presented, the Hearing Officer held that A) Student would not receive FAPE at AHS, but further held

-23-

that B) Andover had not met its burden of proving that Gifford *would* provide Student with FAPE.  BSEA Decision at 9-10.  As a result, the Hearing Officer ordered that "[w]ithin thirty calendar days from the date of [her] Decision, the Andover Public Schools shall locate or create a placement designed for highly intelligent students with Asperger's Syndrome or similar disorders, and shall fund Student's placement in such program." *Id.* at 10.

The Hearing Officer's holding that Student would not receive FAPE at AHS was based on "[t]he uncontroverted evidence on the record . . . that Student requires a small, structured setting capable of explicitly and consistently teaching him [the skills he lacks], during the course of the school day," combined with the uncontroverted evidence that AHS could not adequately serve Student's needs.  *Id.* at 9.  While the Hearing Officer credited the Father's testimony that Student "has friends and participates in activities outside of school," she stated that she:

> also must credit the unanimous testimony of [Andover's] witnesses to the effect that Student has been consistently isolated from interactions with peers and adults in a school setting, has tremendous difficulty when another person, such as a teacher, requires him to operate outside of his own sphere of thinking, and does not appear to have made much progress in this arena.

*Id.*  The hearing officer noted that, while Dr. Doyle testified that Student "could probably be educated within a public high

school, he also testified that he is not familiar with AHS, and, further, that Student would benefit from a level of in-the-moment intervention that Andover acknowledges that AHS cannot provide." *Id.* at 9-10.

With respect to her holding that Andover had not met its burden of proving that Gifford was an appropriate placement for Student, the Hearing Officer noted that the only evidence regarding Gifford's appropriateness came from Mr. Jankauskas, and that no one from Gifford testified at the hearing. *Id*. at 10. Further, she found no evidence in the record concerning the experience of the school or staff in dealing with students with a profile similar to that of Student, and no evidence of the appropriateness of Student's peer group at Gifford. *Id. She specifically noted that "no witnesses from Gifford testified at the hearing." Id*. n.5.

## II.   STANDARD OF REVIEW

The IDEA provides that, when reviewing a hearing officer's decision, a court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C).

The First Circuit recently articulated the standard that
applies to a federal district court's review of a hearing
officer's decision:

> A district court reviews the administrative record, which
> may be supplemented by additional evidence from the parties,
> and makes an independent ruling based on the preponderance
> of the evidence.  However, that independence is tempered by
> the requirement that the court give due weight to the
> hearing officer's findings.  As a result, a district court's
> review falls somewhere between the highly deferential clear-
> error standard and the non-deferential de novo standard.  We
> have characterized this intermediate level of review as one
> of involved oversight.

*D.B. ex rel. Elizabeth B.* v. *Esposito,* 675 F.3d 26, 35-36 (1st
Cir. 2012) (citations, internal quotation marks, and brackets
omitted).

"The application of these standards in the context of a
motion for summary judgment adds a layer of complexity."
*Sebastian M.* v. *King Philip Regional School Dist.*, 685 F.3d 79,
84 (1st Cir. 2012); *see also Ross* v. *Framingham Sch. Comm.*, 44 F.
Supp. 2d 104, 112-13 (D. Mass. 1999).  "As in other
administrative appeals, a motion for summary judgment in an IDEA
case is simply a vehicle for deciding the relevant issues, and
the non-moving party is not entitled to the usual inferences in
its favor."  *Sebastian M.*, 685 F.3d at 84-85; *see Lillbask ex
rel. Mauclaire* v. *Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d
Cir. 2005); *Capistrano Unified Sch. Dist.* v. *Wartenberg*, 59 F.3d

884, 892 (9th Cir. 1995) ("Though the parties may call the
procedure a 'motion for summary judgment'. . . the procedure is
in substance an appeal from an administrative determination, not
a summary judgment."). "Nor does the presence of disputed issues
of fact preclude the award of summary judgment." *See Sebastian
M.*, 685 F.3d at 85 (citing *Capistrano*, 59 F.3d at 891-92).

The First Circuit has observed that "judicial review in IDEA
cases differs substantially from judicial review of other agency
actions, in which courts generally are confined to the
administrative record and are held to a highly deferential
standard of review." *Sebastian M.*, 685 F.3d at 85 (quoting *Ojai
Unified Sch. Dist.* v. *Jackson*, 4 F.3d 1467, 1471 (9th Cir. 1993).
"[T]he district court's authority under [the IDEA] to supplement
the record below with new evidence, as well as Congress's call
for a decision based on the 'preponderance of the evidence,'
plainly suggest less deference than is conventional [in other
administrative appeals]." *Kerkam* v. *McKenzie*, 862 F.2d 884, 887
(D.C. Cir. 1988). The role of the district court is "essentially
[to] conduct a bench trial based on a stipulated record," while
at the same time giving due deference to the findings of the
administrative hearing officer. *Sebastian M.*, 685 F.3d at 85
(quoting *Ojai*, 4 F.3d at 1472). However, the IDEA's provision
for a somewhat less deferential standard of review "is by no

means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Board of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty.* v. *Rowley*, 458 U.S. 176, 206 (1982).

## III.   ANALYSIS

Andover appeals the Hearing Officer's determination that it did not meet its burden of proving that Student would receive FAPE at Gifford, and challenges the authority of the Hearing Officer to order a school district to create or locate a placement for "highly intelligent" students.   Parents cross-appeal the determination that Student would not receive FAPE at Andover High School, and raise additional arguments arising from factual developments that occurred after the close of evidence in the BSEA hearing.   The BSEA opposes both appeals.   For the reasons explained herein, I will affirm the Hearing Officer's decision in large part.

## A.   *Ability of Andover High School is Unable to Offer Student FAPE*

### 1.   Hearing Officer's Findings

Parents challenge the Hearing Officer's determination that Student would not receive FAPE in a regular education setting at Andover High School with appropriate behavioral supports as recommended by Dr. Boyle.   They accuse Andover of possessing

ulterior motives for seeking to remove Student from Andover Public Schools, and contend that through its efforts to obtain an out-of-district placement for Student, Andover is denying Student his right under IDEA to receive FAPE in the "least restrictive environment" possible.  Parents argue that the Hearing Officer failed to discern contradictions in Andover's evidence, failed to credit their evidence properly, and rendered a decision against the weight of the evidence.  While I acknowledge that this is a close case, after thoroughly evaluating the record, I decline to disturb the Hearing Officer's determination.

Although a somewhat obvious point, I note - as the First Circuit has recently observed - that "children of different abilities are capable of different achievements, and '[o]nly by considering an individual child's capabilities and potentialities may a court determine whether an educational benefit provided to that child allows for meaningful advancement.'"  *D.B.*, 675 F.3d at 36 (quoting *Deal* v. *Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 864 (6th Cir. 2004)).  In order to determine whether an IEP confers a "meaningful educational benefit" on a particular student, it "must be gauged in relation to the child's potential."  *D.B.*, 675 F.3d at 36 (quoting *Polk* v. *Central Susquehanna Intermediate Unit 16*, 853 F.2d 171, 185 (3d Cir. 1988)); *see Shore Reg'l High Sch. Bd. of Educ.* v. *P.S. ex rel.*

*P.S.*, 381 F.3d 194, 198 (3d Cir. 2004) ("The IEP must be reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential."). "In most cases," at least where the child's potential is determinable to some degree of certainty, "an assessment of a child's potential will be a useful tool for evaluating the adequacy of his or her IEP." *D.B.*, 675 F.3d at 36.

As the First Circuit has also observed, albeit in a slightly different context, "[d]evelopmental disability takes many forms." *D.B.*, 675 F.3d at 36. This case is somewhat unusual for several reasons, one of which is that the student's disability that makes him eligible for special education is primarily social/behavioral and not intellectual. Accordingly, it is particularly important in this case to assess whether a particular IEP (namely, Parents' proposal for Student to attend AHS) is "reasonably calculated to provide 'effective results' and 'demonstrable improvement' in the various 'education *and personal skills* identified as special needs.'" *Lenn* v. *Portland Sch. Comm.*, 998 F.2d 1083, 1090 (1st Cir. 1993) (emphasis added) (quoting *Town of Burlington* v. *Dep't of Educ. of Mass.*, 736 F.2d 773, 789 (1st Cir. 1984). An IEP "'must target *all* of a child's special needs,' whether they be academic, physical, emotional, or social. *Lenn*, 998 F.2d at 1089

(quoting *Burlington*, 736 F.2d at 788) (emphasis added).
"Education" is broadly defined under the IDEA, and accordingly,
"purely academic progress . . . is not the only indi[cium] of
educational benefit." *Roland M.* v. *Concord Sch. Comm.,* 910 F.2d
983, 992 (1st Cir. 1990); *see Timothy W.* v. *Rochester, N.H. Sch.
Dist.*, 875 F.2d 954, 970 (1st Cir. 1989).

While the Supreme Court has stated that an IEP that places a
student "in the regular classrooms of the public education system
. . . should be reasonably calculated to enable the child to
achieve passing marks and advance from grade to grade," *Rowley*,
458 U.S. at 204, there is no reason to interpret this statement
as restricting the evaluation of the benefit conferred by an IEP
to a strictly academic metric. *See Lenn*, 998 F.2d at 1086
(noting "IEP which places a pupil in a regular public school
program will ordinarily pass *academic* muster" as long as it meets
the aforementioned condition) (emphasis added).

In light of the foregoing, the Hearing Officer was entitled
to conclude that despite Student's arguably satisfactory academic
performance, as evidenced primarily by his seventh grade report
card, and his above average scholastic aptitude, as evidenced by
his standardized test scores, Student was nonetheless unlikely or
unable to receive FAPE in the regular classroom environment at
Andover High School.  The weight of the evidence demonstrated

that Student suffered from severe emotional, social and
behavioral impairments that were inhibiting his development, that
Student had shown no substantial improvement over the course of
his time at Wood Hill Middle School, and that Andover High School
was incapable of providing the environment that Student required.

The Hearing Officer's decision describes in detail the
testimony and evidence presented by both Andover and Parents
regarding Student's educational progress.  Contrary to Parents'
argument, Andover presented substantial evidence regarding
Student's deficits and lack of progress in addressing those
deficits throughout his middle school years.  Staff members from
the middle school testified to Student's consistent rejection of
their efforts to modify his behavior and general lack of progress
in his most significant areas of need.  Dr. Bostic testified that
his main concern was Student's isolation and lack of social
development, and that Student would only begin to make progress
in this area in a small, therapeutic program where student can
develop trust of both his educators and peers.  In addition to
Dr. Bostic's evaluation, two additional outside evaluations – the
STAR Assessment Report from the North Shore Consortium and the
Neuropsychological Evaluation Report by Dr. Abrams concluded that
Student would be best served by a highly structured, highly
predictable environment where he could be provided "in the

moment" behavioral interventions.   The Hearing Officer was entitled to attach such weight to these expert opinions as she deemed appropriate.   *Sebastian M.*, 685 F.3d at 86 ("[t]he valuation of expert testimony is precisely the sort of first-instance administrative determination that is entitled to judicial deference by the district court.").   From my separate vantage point, this assessment of weights was well founded and, indeed, not meaningfully disputed.

Notably, the opinion of Parents' own expert, Dr. Boyle, was not entirely inconsistent with the opinion of Dr. Bostic and the recommendations made in the other expert reports; Dr. Boyle recognized that Student demonstrated the most success when provided with "a clear goal, consistent structure, and supportive response to his documented disabilities."   Although Dr. Boyle expressed his belief that Student's needs could be met in a public high school setting, he admitted that he was not intimately familiar with Andover High School or its ability to provide the kind of support that he believed Student requires.

The record further supports the Hearing Officer's finding that the evidence was uncontroverted as to the inability of Andover High School to serve Student's needs.   Andover High School's program director for special education, John Norton, testified that given the size of the student population, the

number of students in each individual class, and the number of
different teachers from separate departments with whom Student
would have to interact over the course of the day, it simply was
not possible to provide the kind of structure, consistency and
in-the-moment interventions that Student requires.  The Director
of Student Services, Joyce Laundre, testified that having an
instructional assistant accompany Student to class at the High
School would result in stigmatization, and would likely
exacerbate Student's social difficulties.

In their memoranda to this court, Parents advance their view
that Andover has essentially conspired to remove Student from the
Andover Public Schools Student through the device of an
illegitimate, punitive out-of-district placement.  In support of
this argument, Parents' contend that the 45-day placement at
North Shore Consortium was contrived to make it easier for
Andover to argue later that Student would benefit from a
permanent (or at least indefinite) placement in an out-of
district program.  Parents question the legitimacy of the
Functional Behavioral Assessment, which the school conducted
immediately following Student's return from North Shore
Consortium.  Parents also point to the "Student
Observation/Reflection Form[s]," which they argue demonstrate
that Student behaved acceptably during the spring of his eighth

grade year, contrary to Andover's argument that Student has made little or no progress.

Parents' argument that Andover was simply fed up with Student and engaged in an institutional vendetta against him, is, in essence, an attack on the credibility of Andover's witnesses. Credibility determinations, however, are the province of the factfinder, which in this case is the Hearing Officer. *Sudbury Public Schools* v. *Massachusetts Dep't of Elem. and Secondary Educ.*, 762 F. Supp. 2d 254, 262 (D. Mass. 2010); *see also Wytrwal v. Saco Sch. Bd.,* 70 F.3d 165, 171 (1st Cir. 1995) (stating, in a case not involving the IDEA, that the "choice" to credit testimony "is within the discretion of the factfinder").  In the absence of some compelling evidence as to why the testimony of certain of Andover's witnesses should be disregarded, I have no reason to recalibrate the assessment of the credibility of those witnesses or disagree with the Hearing Officer's credibility determinations.  Based upon my review of the record, I accept that a certain amount of animosity developed between Student and the special education Staff at the middle school, which only exacerbated Student's difficulties.  However, this does not change the fact that over three years of middle school, Student was unable to regulate his behavior to a degree where he could function at an acceptable level in the regular education

environment.  I find by a preponderance of the evidence that
Student was being denied FAPE and the Andover High School could
not provide it for this student.

**B.    *The Gifford School Has Not Been Shown To Be Able To Offer
Student FAPE***

Andover argues that the Hearing Officer's determination that
it did not meet its burden of proving that the Gifford School
represents an appropriate placement for Student is legally
erroneous and not supported by the evidence in the record.  I
disagree.

Andover claims it sustained its burden because "it is
undisputed that the Gifford School is a private [special
education] school approved by the Massachusetts Department of
Elementary and Secondary Education" ("DESE") that meets all of
DESE's requirements for educational staffing, and that it
provided evidence about Student's would-be peer group at Gifford.
The fact that Gifford is an approved special education school is
plainly insufficient, by itself, to prove that Gifford would
offer Student a "meaningful educational benefit," or at least an
educational benefit that was any more meaningful than what
student would have received at Andover High School.  As Stephen
Jankauskas indicated in his testimony, several of the other
schools to which he sent referrals on Student's behalf, all of

which were presumably certified special education schools,
responded that they did not feel Student would be a good fit for
their programs.  This is not entirely surprising given that the
disability that makes Student eligible for special education is
social and behavioral in nature, as opposed to other more
traditional learning disabilities.

To be sure, Andover offered evidence of Gifford's
suitability for Student.  However, all of that evidence came in
the form of testimony of two employees of Andover Public Schools,
Mr. Jankauskas and Joyce Laundre, who had only a general
familiarity with Gifford.  Mr. Jankauskas testified to the small
class size, the availability of clinical staff, and the school's
use of a "point-and-level" behavior management system.  He and
Ms. Laundre testified, in general terms, to the "therapeutic
milieu" offered at Gifford.  Mr. Jankauskas also testified that
Gifford educates students who are on the autism spectrum
including students with similar profiles to Student, and that he
felt, based on his one-time observation of two ninth grade
classrooms at the school, that the peer group would be
appropriate for Student.  One would reasonably assume, as the
Hearing Officer apparently did, that superior sources of
information regarding Gifford's suitability for Student would be
readily available – the Hearing Officer was within her discretion

to conclude that Andover had not met its burden of persuasion on
this issue.  The Hearing Officer correctly noted and was
evidently concerned that no evidence had been presented regarding
the "experience of the school or its staff in dealing with
Student's with Asperger's Syndrome or similar issues," and I will
not disturb her determination on this basis.  *See Lessard I*, 518
F.3d at 24 ("Judges are not trained pedagogues, and they must
accord deference to the state agency's application of its
specialized knowledge.").

Further, I reject Andover's argument that the Hearing
Officer applied an incorrect legal standard in concluding that
Andover had not met its burden of persuasion.  Andover
essentially argues that because the IDEA requires only that an
IEP provide "some educational benefit" to a disabled child,
*Rowley*, 458 U.S. at 200, and because the IDEA sets "modest goals
[in that] it emphasizes an appropriate rather than an ideal,
education [and] requires an adequate, rather than an optimal,
IEP," *Lenn,* 998 F.2d 1086, the evidence in the record of
Gifford's appropriateness is more than adequate because it is
obvious that Gifford will provide "some" educational benefit to
Student.  Measured in those terms, however, one could just as
easily argue that Andover High School would provide *some*
educational benefit.  As already discussed, however, IDEA

requires that an IEP confer a *meaningful* educational benefit, where meaningfulness is measured, at least where possible, against a specific student's potential.  *See D.B.*, 675 F.3d at 36.  In light of — as is eminently clear from the record — Student's unique profile, the Hearing Officer was entitled to require a greater demonstration of meaningfulness than what Andover provided.[2]

Finally, Andover objects to the portion of the Hearing Officer's decision that orders it to "locate or create a placement designed for highly intelligent students with Asperger's Syndrome and similar disorders."  It argues that "high intelligence" is not a disability under either 603 Mass. Code Regs. 28.02(9) (listing eligible disabilities) or 20 U.S.C. § 1401(3)(A) (defining "child with a disability"), and therefore a school district cannot be required to factor a student's status as "highly intelligent," "intellectually gifted" or "academically advanced" into a student's specialized instruction.  Andover further argues, that as a practical matter, no such programs exist.

Although I agree with Andover's legal argument in the abstract, I agree with the position advanced by the BSEA in its

---

[2] I note that although it could have, Andover did not request this court hear additional evidence pursuant to 20 U.S.C. § 1415(i)(2)(B), of Gifford's appropriateness.

brief that the Hearing Officer's order should be construed simply to require Andover to create or locate a program designed for students with "similar or comparable profiles as Student."  I find by a fair preponderance of the evidence that Andover did not meet its burden to show that Gifford was an appropriate placement; consequently, as the hearing officer concluded, it remains obligated to find and fund a placement that will provide this student with a fair and appropriate public education.

## C.   *Additional Evidence Offered by Parents*

Contrary to their official position at the BSEA hearing, Parents now argue that Student "does not need IEP or 'therapeutic environment' at all."  In support of this argument, Parents have attached to their memoranda copies of Student's report cards from the private (regular education) parochial school where Student is currently enrolled at Parents' expense.  The report cards indicate that Student has received grades in the mid- to high-nineties (out of one-hundred) in all of his ninth grade courses, as well as positive teacher comments.  Parents, who are *pro se*, did not previously indicate that they intended to offer additional evidence pursuant to 20 U.S.C. § 1415(i)(2)(C) and while this evidence is suggestive of new avenues to explore in the ongoing search for a fair and appropriate public education

for the Student, it is not relevant to the BSEA decision at issue before me now.

## IV.   CONCLUSION

For the reasons set forth above, I deny the respective motions for summary judgment of the Andover School Committee (#23) and the Parents (#26) and thereby AFFIRM the decision of the Hearing Officer in this matter.

I am compelled to observe, however, that all parties may wish to leaven their seemingly intractable and rigid formal positions with a bit of common sense and practicality as they go forward.  To be sure, Andover has demonstrated for now it cannot provide FAPE for the student at Andover High School; yet it has been willing to fund a very expensive alternative at The Gifford School, which for now has not been demonstrated to provide the Student with FAPE either.  For their part, the Parents and the Student seem to be intent on demonstrating, as much for perceived dignitary reasons as for educational ones, that the Student should not be excluded from Andover High School.  Meanwhile, the Student appears from the limited information provided to be flourishing in his current parochial school.

Putting to one side for the moment the opinions of professional educators and behavioralists about appropriate protocols to address the issues confronted by the Student and

noting George Bernard Shaw's mordant observation that "[a]ll professions are conspiracies against the laity,"[3] it might be appropriate for all parties to return to core principles and explore whether the Student's current, less expensive, placement may be providing - the trend of professional thinking in this area to the contrary notwithstanding - a fair and appropriate education for the Student which consequently can properly be publicly funded.  If the parties were to agree to a more cost effective means to provide FAPE, the goals of the parties might be secured without further proceedings.  I, of course, express no view on this matter since the evidence has not been fully developed.  But I suggest the parties consider whether further battle over the purity of their principles should be undertaken at the expense of an available alternative that meets the needs of the Student.


/s/ Douglas P. Woodlock
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

---

[3] GEORGE BERNARD SHAW, THE DOCTOR'S DILEMMA, *reprinted in* THE DOCTOR'S DILEMMA, GETTING MARRIED, AND THE SHOWING-UP OF BLANCO POSNET 1,32 (Brentano's ed., 1920) (1906).